UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IBRAHIMA DIALLO,<br><br>     Plaintiff,<br><br>-against-<br><br>NEW YORK CITY, COUNTY OF WESTCHESTER, WESTCHESTER MEDICAL CENTER, 1-10 NEW YORK CITY POLICE OFFICERS "JOHN DOES", AND 1-10 WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY POLICE OFFICERS "JOHN DOES",<br><br>     Defendants. | No. 23-CV-1238 (LAP)<br><br><u>MEMORANDUM & ORDER</u> |

LORETTA A. PRESKA, Senior United States District Judge:

  Before the Court are Defendants Westchester County ("WC"), Westchester Medical Center ("WMC"), and the City of New York's ("NYC") (together, "Defendants") motions to dismiss the Amended Complaint (dkt. nos. 69, 72, 86)[1] and Plaintiff's oppositions (dkt. nos. 81, 90).[2]  Plaintiff also moves to strike NYC's reply to

---

[1] As set forth in the Court's Order on May 17, 2024, (dkt. no. 80), the Court construes WMC's motion to dismiss as a motion for judgment on the pleadings.  Accordingly, WMC Mot. to Dismiss, Bave Decl., and WMC Mem. are WMC's relevant papers and, according to Plaintiff's letter filed on May 31, 2024, (see dkt. no. 84), Pl. Mem. in Opp'n to WMC Mot., ("Pl. Opp'n Mem. to WMC"), dated June 12, 2023 [dkt. no. 49], is Plaintiff's relevant submission.

[2] See Westchester County's ("WC") Mot. to Dismiss, dated May 2, 2024 [dkt. no. 69]; Decl. of Loren Zeitler in Supp. of WC Mot. to Dismiss ("Zeitler Decl."), dated May 2, 2024 [dkt. no. 70]; WC Mem. of Law in Supp. of Mot. to Dismiss ("WC Mem."), dated May 2, 2024 [dkt. no. 71]; Pl. Mem. in Opp'n to WC Mot. (continued on next page)

Plaintiff's opposition to NYC's motion to dismiss.[3]  Subsequently, NYC moves to strike the substantive portions of Plaintiff's letter regarding its motion to strike.[4]  In addition, Plaintiff also filed a motion requesting leave to file a SAC.[5]  Defendants jointly oppose the motion.[6]  In Defendants' opposition to Plaintiff's request for leave to file a SAC, Defendants alternatively propose that the Court consider their motions to dismiss in light of the SAC.  (See Joint SAC Opp'n. at 2-3.)

For the reasons set out below, Plaintiff's motion to strike, (Pl. Mot. to Strike NYC Reply), is DENIED.  NYC's motion to strike Plaintiff's letter, (NYC Opp'n to Pl. Mot. to Strike), is GRANTED. Plaintiff's motion for leave to amend, (Pl. SAC Mot.), is DENIED,

---

(cont'd) ("Pl. Opp'n Mem. to WC."), dated May 17, 2024 [dkt. no. 81]; WC's Reply ("WC Reply"), dated June 3, 2024 [dkt. no. 85]; Westchester Medical Center's ("WMC") Mot. to Dismiss, dated May 7, 2024 [dkt. no. 72]; Decl. of William Bave in Supp. of WMC Mot. to Dismiss ("Bave Decl."), dated May 7, 2024 [dkt. no. 73]; WMC Mem. of Law in Supp. of Mot. to Dismiss ("WMC Mem."), dated May 7, 2024 [dkt. no. 74]; NYC Mot. to Dismiss, dated June 10, 2024 [dkt. no. 86]; NYC Mem. of Law in Supp. of Mot. to Dismiss ("NYC Mem."), dated May 10, 2024 [dkt. no. 87]; Pl. Mem. in Opp'n to NYC Mot. ("Pl. Opp'n Mem. to NYC"), dated June 28, 2024 [dkt. no. 90]; NYC's Reply ("NYC Reply"), dated July 5, 2024 [dkt. no. 91].

[3] See Pl. Letter Mot. to Strike NYC's Reply ("Pl. Mot. to Strike NYC Reply"), dated July 9, 2024 [dkt. no. 92].

[4] See NYC's Letter in Opp'n to Pl. Mot. to Strike ("NYC Opp'n to Pl. Mot. to Strike"), dated July 22, 2024 [dkt. no. 95].

[5] See Letter Request for Leave to File Second Amended Complaint ("Pl. SAC Mot."), dated Aug. 20, 2024 [dkt. no. 96]; Pl. Reply ("Pl. SAC Reply"), dated Aug. 26, 2024 [dkt. no. 98].

[6] See Defs.' Joint Letter in Opp'n ("Joint SAC Opp'n"), dated Aug. 20, 2024 [dkt. no. 97].

and Defendants WC and NYC's motions to dismiss Plaintiff's federal claims, (WC Mot. to Dismiss; NYC Mot. to Dismiss), are GRANTED. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and therefore dismisses all remaining state law claims and Defendant WMC's motion to dismiss, (WMC Mot. to Dismiss), without prejudice to renewal in a state court of competent jurisdiction.

I.   **Background**

The following facts are drawn from Plaintiff's proposed SAC (see dkt. no. 96-1 (hereinafter "SAC")) and are taken as true for purposes of resolving the instant motions.  See Faber v. Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011).

A.   **Factual Background**

Plaintiff is a Guinean man who has been living in the United States as a political asylee since 2010. (See SAC ¶¶ 1, 18.)  At the time of his arrest in 2018, he was a resident of the Bronx and earned a living working as a dishwasher and handyman.  (Id. ¶¶ 21-26.)  Although Plaintiff previously had interactions with law enforcement, he did not have a criminal record.  (Id. ¶¶ 27, 29-36.)

In the early morning hours of February 18, 2018, a robbery occurred in Yonkers, New York.  (Id. ¶¶ 40-41; dkt. no. 1, Ex. 1

at 5.[7])  At approximately 4:30 a.m., the victim, Rosa, and his friend, Richard Ferreras, returned to Rosa's house after a concert. (See dkt. no. 1, Ex. 1 at 5.)  As they approached the house, three men ran up from behind.  (Id.)  One of the males, later identified as Musa Krubally, pushed Rosa to the ground and continued towards Mr. Ferreras, while another stated he had a gun and would use it if they fought back.  (Id.)  The three assailants stole a designer bag, a gold Cuban link chain, and an expensive watch before retreating to their getaway car, where a fourth male was waiting for them.  (Id.)  As the robbers drove off, Rosa noticed their car had a New Jersey temporary plate labeled 060293R.  (Id.)  The whole encounter lasted only moments.  (Id.)  When Rosa and Mr. Ferrara were on the phone with the police, Mr. Ferrara indicated he would not be able to identify anyone.  (Id.)  Rosa was unsure whether he would be able to identify the perpetrators but indicated that he "may possibly be able to identify one of the suspects, the one who took his property."  (Id. at 6.)  Rosa described two perpetrators as wearing masks, including the one that threatened the gun.  (Id. at 5-6.)  Rosa described the male wearing camouflage pants as thinner and not wearing a mask.  (Id. at 6.)  Video surveillance recovered from the scene could not identify the robbers.  (Id. at 5.)

---

[7] Citations for this exhibit only are to the ECF page number instead of the original page number on the document.

In March of 2018, a month after the robbery, the New York City Police Department ("NYPD") informed the Yonkers Detectives that there had been similar robberies involving a vehicle with various temporary New Jersey tags. (Id. at 6.) The NYPD sent the Yonkers Detectives several images of suspects from the NYPD investigation. (Id.) All five images were of people who were Guinean. (SAC ¶¶ 136-38.) Based on this information, Yonkers Detectives prepared a photo array which contained an image of Plaintiff.[8] (Dkt. no. 1, Ex. 1 at 6.) The photo array consisted of six images, and Plaintiff was the only Guinean in the photo array. (SAC ¶¶ 142-45.) On March 18, 2018, Rosa appeared at the Yonkers Detective Division to view several photo arrays. (Dkt. no. 1, Ex. 1 at 6.) Before he was shown the photo array, detectives told him that the individuals who robbed him were Guineans. (SAC ¶ 146.) Rosa viewed several double-blind photo arrays and identified Plaintiff as the man "wearing the camo pants and who threatened that he had a gun" and Krubally as the "big guy" who took his property. (Dkt. no. 1, Ex. 1 at 6.)

On November 30, 2018, "the People presented relevant and legally sufficient evidence of the above crimes to the grand jury,

---

[8] Plaintiff alleges in the Complaint that NYC provided his photo to WC. (Compl. ¶ 80.) WC argues in its Reply that it was the detectives from the City of Yonkers, not WC, who prepared the photo array; however, this point is academic as Yonkers is within WC. (WC Reply at 3-4.)

and a true bill was voted against [Plaintiff].  The only witness to testify was Rosa."  (Id.)  On December 4, 2018, an indictment was filed, and an arrest warrant was obtained for Plaintiff.  (Id.)  Co-defendant Krubally sought a pre-indictment disposition and subsequently pled guilty to a reduced count of Attempted Robbery in the First Degree.  (Id. at 6-7.)  Several years later, on October 19, 2021, the indictment warrant for Plaintiff was executed.  (Id. at 7.)  Plaintiff was arraigned on the indictment and pled not guilty.  (Id.)

Plaintiff contends that his "arrest was brutal."  (SAC ¶ 96.) Police from the Westchester County Department of Public Safety ("WDPS") and NYPD appeared at Plaintiff's apartment around 6:00 a.m.  (Id. ¶ 97.)  During his arrest, he informed the officers that he suffers from tuberculosis of the spine.  (Id. ¶¶ 98-99.) Nonetheless, the police "bent, squeezed, and shoved [Plaintiff] such that [Plaintiff's] spine curved to where he lost feeling in his lower body and his extremities."  (Id. ¶ 100.)

His experience in jail was no better.  (Id. ¶ 102.)  Upon arriving to jail, he was subject to a strip search and isolated in a cell because the Westchester County Department of Corrections ("WDOC") incorrectly believed that tuberculosis of the spine was contagious.  (Id. ¶¶ 103-105.)  His cell was too cold, which caused his condition to worsen.  (Id. ¶ 111.)  He was denied a mat to pray in accordance with his Muslim faith.  (Id. ¶ 107.)  This

resulted in his inability to pray forty different times. (Id.) Plaintiff also claims that the medical treatment he received was inadequate. (Id. ¶¶ 106, 108, 110.) Soon after arriving at jail, he was seen by WMC which he claims, "refused to allow him to take his medication in the proper dosage." (Id. ¶ 108.) Plaintiff claims that because he was denied proper medical treatment, he "suffered an extraordinary amount of pain while confined." (Id. ¶ 122.) Plaintiff also claims that he is depressed and lost his employment and his home. (Id. ¶¶ 126-132.) Plaintiff was jailed for eight days until he was released on bail. (Id. ¶ 125.)

Roughly one year after being released, on October 12, 2022, the District Attorney's Office filed a motion to dismiss the indictment. (Dkt. no. 1, Ex. 1 at 3.) The District Attorney's Office explained that "due to the quality of the evidence and due to the passage of time since the incident, there is a legal impediment to defendant Ibrahima Diallo's conviction." (Id. at 8.) On October 13, 2022, the action against him was dismissed. (Id. at 10.)

**B.  Procedural Background**

On February 15, 2023, Plaintiff filed his original Complaint against WC, NYPD, WDOC, WDPS, WMC, and multiple "John Doe" Officers of NYPD and WDPS. (Dkt. no. 10.) On May 4, 2023, WMC filed a motion for judgment on the pleadings. (Dkt. no. 41.) On May 5, 2023, WC, WDOC, and WDPS, filed a motion to dismiss the Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. no. 44.)  On August 28, 2023, NYPD also filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6).  (Dkt. no. 59.)

On March 19, 2024, the Court issued an order and memorandum granting Defendants' motions.  (Opinion & Order ("Mar. 19 Order"), dated Mar. 19, 2024 [dkt. no. 67].)  First, the Court addressed the misjoinder of non-suable City and County Defendants, substituting NYC for all claims against the NYPD, and WC for all claims against WDPS and WDOC.  (Id. at 6.)  Accordingly, NYC, WDPS, and WDOC were dismissed as parties from the action.  (Id.)  Next, the Court granted Defendants' motions to dismiss Plaintiff's federal claims and declined to exercise supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice to allow leave to amend.  (Id. at 15.)

On April 18, 2024, Plaintiff filed his First Amended Complaint against WC, NYC, WMC, and multiple "John Doe" Officers from the NYPD and WDPS.  (Dkt. no. 68.)  On May 2, May 7, and June 10, 2024, WC, WMC, and NYC, respectively, filed separate motions to dismiss, each pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (WC Mot. to Dismiss; WMC Mot. to Dismiss; NYC Mot. to Dismiss)

On May 7, 2024, Plaintiff filed a letter requesting leave to file a motion to strike WMC's motion to dismiss.  (Dkt. no. 75.)  On May 17, 2024, the Court granted in part and denied in part

Plaintiff's motion and stated that the Court will construe WMC's motion to dismiss as a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  (Dkt. no. 80 at 3-4.)

On July 9, 2024, Plaintiff filed a motion to strike NYC's reply to his memorandum of law in opposition to NYC's motion to dismiss.  (Pl. Mot. to Strike NYC Reply.)  In NYC's opposition to Plaintiff's motion, NYC also cross-moved to strike the latter two-thirds of Plaintiff's letter-motion on the basis that it is an improper sur-reply to NYC's reply in support of its motion to dismiss.  (NYC Opp'n to Pl. Mot. to Strike at 2.)

On August 20, 2024, Plaintiff filed a motion seeking leave to file a SAC.  (Pl. SAC Mot.)  On the same day, Defendants filed a joint letter in opposition requesting the Court deny Plaintiff leave to amend, or, in the alternative, decide the outstanding motions to dismiss and motion for judgment on the pleadings against the SAC.  (Joint SAC Opp'n at 2-3.)

## II.  **Applicable Law**

### A.  **Motions to Strike**

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure a court may, on its own or on motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Apart from pleadings, a court has "inherent authority to strike any filed paper which it

determines to be abusive or otherwise improper under the circumstances." Sierra v. United States, No. 97 Civ. 9329 (RWS), 1998 WL 599715, at *9 (S.D.N.Y. Sept. 10, 1998); see also Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin., 884 F. Supp. 2d 108, 115 n.5 (S.D.N.Y. 2012).

### i. Local Rule 7.1

At the time of the relevant filings, Local Rule 7.1(b) stated: "Except for letter-motions as permitted by Local Rule 7.1(d) or as otherwise permitted by the court, all oppositions and replies with respect to motions must comply with Local Civil Rules 7.1(a)(2) and (3) above, [which require a memorandum of law and supporting affidavits and exhibits] . . . ."[9]  S.D.N.Y. L.R. 7.1.(b).

Local Rule 7.1(d) allows letter-motions for "[a]pplications for extensions or adjournments, applications for a pre-motion conference, and similar non-dispositive matters . . . ." S.D.N.Y. L.R. 7.1.(d).  On July 1, 2024, Local Rule 7.1(d) was revised "to specify the types of motions that may be brought by letter-motion and to make explicit that other motions may not be brought by letter-motion . . . ."  Id.

---

[9] See Joint SDNY and EDNY Local Rules, Committee Note to Rule 7.1, effective July 1, 2024, available at https://nysd.uscourts.gov/sites/default/files/local_rules/2024-07-01%20Joint%20Local%20Rules.pdf.

Generally, the Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009); see, e.g., Commerzbank AG v. U.S. Bank, N.A., 100 F.4th 362, 377-78 (2d Cir. 2024). "It is the business of the district court to determine whether fairness demands that noncompliance be excused." Wight v. BankAmerica Corp., 219 F.3d 79, 85-86 (2d Cir. 2000) (internal citations omitted).

### ii. Sur-reply

The Local Rules do not specifically contemplate sur-replies, but they also do not bar their use. However, sur-replies are not allowed absent leave of the Court, and they "should be viewed as the exception and not the rule." United States v. Int'l Bus. Machs. Corp., 66 F.R.D. 383, 384 (S.D.N.Y. 1975).

If a party files a document responding to the substance of the other party's reply in support of its motion, the Court will construe the document as a sur-reply. See, e.g., Trombetta v. Novocin, 18 Civ. 993 (RA) (SLC), 2020 WL 6365171, at *1 (S.D.N.Y. Oct. 29, 2020) (construing a plaintiff's "second response" as a sur-reply); Penzo v. Consol. Edison Co. of N.Y., Inc., 19 Civ. 07478, 2024 WL 3824072, at *16 (S.D.N.Y. Aug. 15, 2024) (same). "Sur-replies are appropriate only in 'the exceptional though rare

case' when a 'party demonstrates to the court that papers to which
it seeks to file a reply raise new issues which are material to
the disposition of the question before the court,'" or when the
court orders additional briefing for its own benefit.  S.E.C. v.
Xia, 21 Civ. 5350 (PKC) (RER), 2022 WL 2784871, at *1 (E.D.N.Y.
July 15, 2022) (quoting Int'l Bus. Machs. Corp., 66 F.R.D. at 384);
see also Penzo, 2024 WL 3824072, at *16.

    **B.   Motion for Leave to Amend**

It is well established that, where a party cannot amend as a
matter of course, courts should freely give leave to amend a
complaint "when justice so requires."   See Fed. R. Civ. P.
15(a)(2); Foman v. Davis, 371 U.S. 178, 182 (1962); Keller v.
Schoharie Cty. Dep't of Soc. Servs., 848 F. App'x 38, 39 (2d Cir.
2021).  However, "[a] district court has discretion to deny leave
for good reason, including futility, bad faith, undue delay, or
undue prejudice to the opposing party."   McCarthy v. Dun &
Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (citing Foman,
371 U.S. at 182).   "To determine whether a proposed pleading is
futile, courts analyze whether it would withstand a motion to
dismiss." Agerbrink v. Model Serv. LLC, 155 F. Supp. 3d 448, 456
(S.D.N.Y. 2016); see also Carroll v. Trump, 590 F. Supp. 3d 575,
579 (S.D.N.Y. 2022) ("[I]t is unexceptional for federal courts to
deny leave to amend on the basis of futility where the proposed
amended pleading would not withstand a motion to dismiss.").

Moreover, "[t]he opposing party must establish that granting leave to amend would be futile." Blagman v. Apple, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 2106489, at *5 (S.D.N.Y. May 19, 2014). Like when considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all well-pleaded facts and draw all reasonable inferences in the moving party's favor. Agerbrink, 155 F. Supp. 3d at 456.

The Court of Appeals has noted that "[w]here a plaintiff seeks to amend its complaint while a motion to dismiss is pending, a court 'may either deny the pending motion to dismiss as moot or consider the merits of the motion, analyzing the facts as alleged in the amended pleading.'" Env't Sols. Assocs. Grp., LLC v. Conopoco, Inc., No. 20 Civ. 10699 (MKV), 2021 WL 2075586, at *1 (S.D.N.Y. May 24, 2021) (quoting Pettaway v. Nat'l Recovery Sols., LLC, 955 F.3d 299, 303 (2d Cir. 2020)). This approach "promotes judicial economy by obviating the need for multiple rounds of briefing addressing complaints that are legally insufficient." Pettaway, 955 F.3d at 303.

**C. Motions to Dismiss Under Rule 12(b)(6)**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient facts "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true

all well-pleaded facts and draw all reasonable inferences in favor
of the plaintiff.  Id. at 678.  But the court is not bound to
accept as true legal conclusions that are couched as factual
allegations.  Id.  "Nor does a complaint suffice if it tenders
'naked assertion[s]' devoid of 'further factual enhancement.'"
Id. (citing Twombly, 550 U.S. at 557).  If there are insufficient
factual allegations to raise a right to relief above the
speculative level, the complaint must be dismissed.  Twombly, 550
U.S. at 555.

### D.   Motion for Judgment on the Pleadings Under Rule 12(c)

The Federal Rules of Civil Procedure provide that "[a]fter
the pleadings are closed—but early enough not to delay trial—a
party may move for judgment on the pleadings."  Fed. R. Civ.
P. 12(c).  In this Circuit, "[t]he standard for granting a Rule
12(c) motion for judgment on the pleadings is identical to that
for granting a Rule 12(b)(6) motion for failure to state a claim."
Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 301 (2d
Cir. 2021) (quoting Lynch v. City of N.Y., 952 F.3d 67, 75 (2d
Cir. 2020)).

### E.   Individual and Municipal Liability Under Section 1983

To make a claim under Section 1983 of the Civil Rights Act,
a plaintiff must allege that "(1) the challenged conduct was
attributable at least in part to a person who was acting under
color of state law and (2) the conduct deprived the plaintiff of

a right guaranteed under the Constitution of the United States."
Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999).

To establish individual liability under Section 1983, "a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Kravitz v. Purcell, 87 F.4th 111, 129 (2d Cir. 2023) (quoting Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013)). To do so, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" Id. (quoting Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020)). "The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary." Id.

To prevail on a claim against a municipality under Section 1983 based on acts of a public official, a plaintiff is required to prove: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citing Monell v. City of N.Y. Dep't of Soc. Serv's, 436 U.S. 658, 690-91 (1978)). "Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible,

there is no basis for holding the municipality liable." Askins v.
Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013).   Accordingly, the
Court turns first to the question of whether Plaintiff has
plausibly alleged a federal law tort.   Id.   Only where Plaintiff
has plausibly alleged the commission of a federal tort will the
Court consider whether such action was taken pursuant to an
official policy or custom sufficient to establish municipal
liability pursuant to Monell.   Id.

### III. **Discussion**

#### A. **Motion to Strike**

Plaintiff moves to strike Defendant NYC's Reply, (NYC Reply),
on the basis that it does not comply with Local Rule 7.1(a)(2)'s
requirements.   (Pl. Mot. to Strike NYC Reply.)   While Plaintiff is
correct that NYC did not format its Reply in accordance with the
Local Rules, on balance, the Court is unpersuaded that this
technicality should result in the Reply's being stricken.   NYC
should have followed the proper format for a Reply, but, given it
is short and contains a limited amount of new substance, the Court
accepts it.   See Wight, 219 F.3d at 85 (internal citations omitted)
("It is the business of the district court to determine whether
fairness demands that noncompliance be excused.").

Additionally, NYC cross-moves to strike the latter two-thirds
of Plaintiff's letter-motion on the basis that it is an improper
sur-reply to NYC's Reply.   (NYC Opp'n to Pl. Mot. to Strike at 2.)

The Court agrees.  Plaintiff likely filed his letter-motion to strike as a way to conceal his true intent—to address substantively arguments in NYC's Reply.  Plaintiff specifically writes, starting in paragraph three, "[t]he Court should also ignore New York City's arguments." (Pl. Mot. to Strike NYC Reply at 1.)  Plaintiff then spends approximately two pages engaging with arguments NYC asserted in its Reply including, <u>inter alia</u>, the impact of the United States Supreme Court's recent decision in <u>Gonzalez v. Trevino</u>, 602 U.S. 653, 676 (2024) (per curiam).  (Pl. Mot. to Strike NYC Reply at 1-3; NYC Reply at 2.)  Thus, Plaintiff's letter constitutes an unauthorized sur-reply, and may be stricken by the Court.  <u>See</u> <u>Trombetta</u>, 2020 WL 6365171, at *1; <u>Penzo</u>, 2024 WL 3824072, at *16; <u>Nat. Res. Def. Council</u>, 884 F. Supp. 2d at 115 n.5.

Accordingly, Plaintiff's motion to strike NYC's Reply is DENIED, and NYC's motion to strike Plaintiff's letter is GRANTED.[10] As a result, the Court does not consider Plaintiff's letter, (Pl. Mot. to Strike NYC Reply), or NYC's letter, (NYC Opp'n to Pl. Mot. to Strike), any further.

---

[10] Technically, both Plaintiff and NYC should have submitted letters requesting a pre-motion conference seeking leave to file motions to strike.  J. Preska Individual Practices Rule 2(A). Instead, both parties skipped the Court's required step and filed letter-motions.

**B.   Motion for Leave to Amend**

The standard for determining futility is whether proposed amendments would withstand a motion to dismiss.  Trump, 590 F. Supp. 3d at 579.  Here, Defendants each have either a motion to dismiss or a motion for judgment on the pleadings pending, which the Court considers against the proposed amended pleadings. Pettaway, 955 F.3d at 303.  (WC Mot. to Dismiss; WMC Mot. to Dismiss; NYC Mot. to Dismiss.)  Accordingly, the Court will evaluate each claim, in light of Plaintiff's proposed amendments, to determine if it states any valid legal claims that could survive a motion to dismiss.

For the reasons set out below, Plaintiff's amendments in his SAC do not add sufficient factual or legal allegations to create a legally cognizable claim.  McCarthy, 482 F.3d at 200.  Because Plaintiff's amendments are futile, Plaintiff's motion seeking leave to amend is DENIED.

**C.   Malicious Prosecution Under Section 1983**

Plaintiff sues Defendants NYC and WC, as well as officers and detectives from NYC and WC, for malicious prosecution because Defendants "without probable cause[,] caused [Plaintiff] to be arrested under a warrant and jailed," "used excessive force," and "acted with malice" in Plaintiff's prosecution.  (SAC ¶¶ 181-85.)

"To prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his

rights under the Fourth Amendment,[] and must establish the elements of a malicious prosecution claim under state law[.]" Manganiello v. City of N.Y., 612 F.3d 149, 160-61 (2d Cir. 2010). Under New York law, to establish a malicious prosecution claim, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id. at 161 (quoting Murphy v. Lynn, 118 F.3d at 938, 947 (2d Cir. 1997)). Generally, "the existence of probable cause is a complete defense to a claim of malicious prosecution . . . and indictment by a grand jury creates a presumption of probable cause[.]" Id. at 161-62 (quoting Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003)) (internal quotations omitted). However, that presumption may be rebutted by "evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Id. (internal quotations omitted).

Plaintiff alleges that probable cause does not exist because "there was absolutely no evidence that tied [him] to the crime other than the fact that [WC and NYC] had included him . . . because he is a black person from Guinea" and that he "could not have committed the crimes with which he was charged." (SAC ¶¶ 179, 184.) Plaintiff fails to address the single most important

19

fact—the victim identified Plaintiff from several double-blind photo arrays and was the only person to testify to the grand jury. (Dkt. no. 1. Ex. 1. at 6.)   The Court of Appeals has held that "[a]bsent circumstances that raise doubts as to the victim's veracity, a victim's identification is typically sufficient to provide probable cause." McGrier v. City of N.Y., 849 F. App'x 268, 270 (2d Cir. 2021).   The SAC does not make any allegations regarding the veracity of the victim's testimony.[11]   Additionally, Plaintiff was arrested pursuant to a warrant after he was indicted by a grand jury, which gives rise to the presumption that his arrest was supported by probable cause.

Plaintiff's malicious prosecution claim fails against NYC and WC because he cannot rebut the presumption of probable cause.[12]

---

[11] The victim's statements about being able to identify the perpetrators right after the incident as compared to the victim's statements during the identification are slightly in conflict. (See dkt. no. 1. Ex. 1 at 5-6.)   However, the conflict is not sufficient to raise doubts that outweigh the probable cause established after the victim's grand jury testimony.   See Norwood v. Mason, 524 F. App'x 762, 765 (2d Cir. 2013) ("New York courts routinely hold that a victim's photo identification of a person provides the police with probable cause to arrest that person, even where the identification may not be 100% reliable.").

[12] Plaintiff's malicious prosecution also fails against Defendant NYC because no one from the NYPD initiated the prosecution against Plaintiff.   Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000) ("A person who tells law enforcement authorities that he or she thinks that a crime has been committed and does no more, does not thereby put him- or herself at risk of liability for malicious prosecution should the arrest or prosecution later be abandoned or result in an acquittal.").
(continued on next page)

Plaintiff adds paragraphs 147-179 to the SAC in an attempt to rebut the presumption of probable cause.  Plaintiff alleges that NYC acted in bad faith when it provided Plaintiff's photo and WC acted in bad faith when it created a suggestive photo array that was used to identify him.  However, "at most, the allegations permit an inference that [the Yonkers Detectives] performed subpar police work when conducting the photo array used to identify [Plaintiff], not an inference of conduct rising to the level of fraud, perjury, suppression of evidence, or other bad faith."  <u>Delamota v. City of N.Y.</u>, 683 F. App'x 65, 66 (2d Cir. 2017).

Plaintiff also alleges that his prosecution was undertaken in bad faith for, <u>inter alia</u>, the following reasons: the officers and detectives knew there was a surveillance video of the crime and that Plaintiff did not appear in the video, (SAC ¶ 150), and WC chose to bring charges against him despite this exculpatory evidence and did not disclose the video's existence to the grand jury, (SAC ¶¶ 154, 95); WC failed to disclose to the grand jury circumstances surrounding the photo array, (SAC ¶ 152-53, 171-72, 174, 176-77), including that Plaintiff was the only Guinean after Defendants told the victim that the perpetrator was Guinean, (SAC

_____

(cont'd) The NYPD's only role related to this case was providing "several images of suspects from the NYPD investigation . . . to Yonkers Police" to share investigative materials for a similar pattern of robberies with the neighboring police agency.  (Dkt. no. 1 Ex. 1 at 6.)

¶¶ 92, 146); WC failed to disclose to the grand jury many personal characteristics of Plaintiff that make it unlikely that he committed the crime, (SAC ¶¶ 49-59, 90, 155-64); and, "the way the testimony was provided to the grand jury made it appear as if the victim knew that it was [Plaintiff] who had robbed him," (SAC ¶ 148). (Pl. SAC Reply at 2.) These allegations do not show that any of the Defendants fabricated, falsified, or suppressed evidence, or otherwise acted in bad faith regarding Plaintiff's grand jury indictment. See Savino, 331 F.3d at 72; Grier v. City of Mount Vernon, 16 Civ. 5146 (NSR), 2019 WL 1171760, at *4 (S.D.N.Y. Mar 13, 2019). At most, these allegations show the weaknesses of the case against Plaintiff.

Regarding the surveillance video, all that Plaintiff exposes is that the officers and detectives complied with their duty to turn over evidence to the prosecution, who then evaluated all the evidence and still chose to bring charges. See Alba v. City of New York, No. 23 Civ. 8619 (LAK) (BCM), 2024 WL 5359912, at *31 (S.D.N.Y. Aug. 26, 2024) ("[I]f the defendant is a police officer, 'the scope of possible liability is necessarily more limited because police officers satisfy their obligation under Brady when they turn over exculpatory information to prosecutors, unless there is some indication that the police have suppressed evidence.'" (quoting Hincapie v. City of N.Y., 434 F. Supp. 3d

61, 76 (S.D.N.Y. 2020))).[13]  Crucially, Plaintiff does not allege
that the officers or detectives intentionally withheld
information, made a single misrepresentation, or otherwise acted
to "corrupt[] the truth-seeking function of the trial process."
<u>Manganiello</u>, 612 F.3d at 162.

   With regard to bringing charges and what information was
disclosed to the grand jury, these allegations are applicable to
the prosecutors, as opposed to the officers and detectives.[14]
However, the prosecutors are protected by absolute immunity.

---

[13] While Plaintiff does not allege a <u>Brady</u> violation in his SAC,
the issue of evidence suppression gets to the heart of both bad
faith malicious prosecution and <u>Brady</u> violation claims.  Thus,
<u>Brady</u> standards are a relevant benchmark here.  <u>See</u> <u>Newson v.
City of N.Y.</u>, No. 16 Civ. 6773 (ILG) (JO), 2019 <u>WL</u> 3997466,
at *4 (E.D.N.Y. Aug. 22, 2019) ("[T]he question of whether a
'<u>Brady</u>' claim may be brought by an acquitted plaintiff is
academic.  In cases where a plaintiff has been deprived of his
liberty prior to trial due to the State's suppression of
exculpatory evidence, courts have recognized that he may bring a
[malicious prosecution claim pursuant to § 1983].").
[14] The Court does not consider the officers or detectives'
potential for qualified immunity because the Court need not
proceed in the analysis.  <u>Sabir v. Williams</u>, 52 F.4th 51, 64 (2d
Cir. 2022) (stating that "[a]lthough it is possible for a
qualified immunity defense to succeed on a motion to dismiss,
. . . "[it] is usually not successful"); <u>Liberian Cmty. Ass'n of
Conn. v. Lamont</u>, 970 F.3d 174, 186 (2d Cir. 2020); <u>Chamberlain
Est. of Chamberlain v. City of White Plains</u>, 960 F.3d 100, 110
(2d Cir. 2020) ("[A]s a general rule, the defense of qualified
immunity cannot support the grant of a [Rule] 12(b)(6)
motion."); <u>Field Day, LLC v. Cnty of Suffolk</u>, 463 F.3d 167, 191-
92 (2d Cir. 2006); <u>McKenna v. Wright</u>, 386 F.3d 432, 436 (2d Cir.
2004) ("Nevertheless, we see no reason why even a traditional
qualified immunity defense may not be asserted on a Rule
12(b)(6) motion as long as the defense is based on facts
appearing on the face of the complaint.").

Shmueli v. City of N.Y., 424 F.3d 231, 236 (2d Cir. 2005) ("Further, although absolute immunity is an affirmative defense whose availability depends on the nature of the function being performed by the defendant official who is alleged to have engaged in the challenged conduct . . . the nature of that function is often clear from the face of the complaint.  In that circumstance, the absolute immunity defense may be resolved as a matter of law on a motion to dismiss the complaint pursuant to Rule 12(b)(6)." (internal citations omitted)).  "[T]he initiation and pursuit of a criminal prosecution are the quintessential prosecutorial functions protected by absolute immunity[.]"  Alba, 2024 WL 5359912, at *16 (quoting Shmueli, 424 F.3d at 237) (internal quotations omitted).  Those functions include "making decisions on whether to present a case to a grand jury . . . as well as obtaining, reviewing, and evaluating evidence in preparation for the initiation of charges or for trial."  Id. (quoting Imbler v. Pachtman, 424 U.S. 409, 431 n.33 (1976) (internal quotations omitted)); see also Simon v. City of N.Y., 727 F.3d 167, 171 (2d Cir. 2013) (absolute immunity protects a prosecutor when "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions").  Such prosecutorial discretion is absolutely immune and cannot prove bad faith.  See Alba, 2024 WL 5359912, at *15-16.

Additionally, Plaintiff alleges that many personal, and in Plaintiff's view, exculpatory characteristics were not shared with the grand jury, including, <u>inter alia</u>, that Plaintiff had spinal tuberculosis, speaks little English and when he does has a heavy accent, and the vehicle suspected of being at the crime scene was not registered to him. (SAC ¶ 49-59, 90, 155-57, 159-64.) It is not clear that the detectives, officers, or prosecutors were aware of these facts prior to his indictment and arrest. Even Plaintiff acknowledges that the officers did not "before seeking an indictment . . . [seek] to interview [him] or obtain his cell phone records." (SAC ¶ 170.) Therefore, because this information was unknown to the Defendants, it could not be shared with the grand jury. Plaintiff further alleges that WC did not disclose to the grand jury that it "had no information of [Plaintiff's] being present at the time of the crime." (SAC ¶ 158.) This is false. Rosa identified Plaintiff in a double-blind photo array as being present at the time of the crime.

Furthermore, Plaintiff's allegation that the victim knew he was the only Guinean in the photo array also fails to prove bad faith because he fails to explain (1) how nationality would be identifiable in a photo array, and (2) how informing the victim of Plaintiff's nationality, an invisible attribute, is a bad faith act. (<u>See</u> SAC ¶¶ 92, 94, 144, 146.) Without more, Plaintiff's conclusory statements do not prove bad faith. <u>Savino</u>, 331 F.3d at

25

73 (finding that a plaintiff cannot rebut a presumption of probable cause "with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." (quoting <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991))). Consequently, Plaintiff's SAC fails to demonstrate that his indictment was "procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." <u>Grier</u>, 2019 WL 1171760, at *4.

All of Plaintiff's allegations unquestionably show weaknesses in the case brought against him but do not allege that Defendants intentionally withheld information or acted to corrupt the truth-seeking function of the trial process. Because Plaintiff has failed to allege facts sufficient to rebut the presumption of probable cause, dismissal of Plaintiff's malicious prosecution claim is warranted.

### D.   Defamation Under Section 1983

Plaintiff sues Defendants NYC and WC for defamation. (SAC ¶¶ 185-192.) Plaintiff claims that the NYPD defamed him by providing pictures of him to WC and WC caused those pictures to be placed in a line-up and provided the pictures to third parties who made a mistaken identification. (<u>Id.</u>) Thus, Defendants branded Plaintiff as a criminal leading to his loss of employment opportunities, housing, and family relationships. (<u>See</u> <u>id.</u>; Pl. Opp'n Mem. to NYC at 21-22.)

As to the claim against WC, neither WC nor Plaintiff addresses the defamation claim in their papers though they were on notice of their failure to do so in the Court's March 19, 2025 Order.  (See WC Mem.; Pl. Opp'n Mem. to WC; WC Reply; Mar. 19 Order.)  Because WC moves to dismiss the Complaint in its entirety, (WC Mem. at 3), and because Plaintiff does not defend this theory, the Court deems the defamation claim against WC waived.  Felix v. City of N.Y., 344 F. Supp. 3d 644, 655 (S.D.N.Y. 2018) ("[B]ecause Defendant clearly styles its motion as a motion to dismiss all municipal liability claims . . . and because Plaintiff does not defend this theory, the Court deems it waived." (internal citation omitted)).

As to the claim against NYC, to make a federal claim for defamation a Plaintiff must demonstrate "a stigmatizing statement plus a deprivation of a tangible interest." Burgos Vega v. Lantz, 596 F.3d 77, 81 (2d Cir. 2010) (quoting Algarin v. Town of Wallkill, 421 F.3d 137, 138 (2d Cir. 2005)).  To establish a stigma plus claim, a plaintiff must show "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." Id. (quoting Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004)) (internal quotations omitted).  Here, Plaintiff does not clearly articulate what the false statement or false paperwork was.  Even

if Plaintiff argued that the photograph was a false statement because it was "designed to make him look like a criminal instead of . . . his true-clean cut appearance," Plaintiff confirms the photo is of him.  (SAC ¶ 167.)  Additionally, Plaintiff merely asserts that "[t]he publication has cause[d] [him] special harm [that] constitutes defamation per se."  (SAC ¶ 191.)  Without a false statement, however, his claim fails as a matter of law.  See Burgos Vega, 596 F.3d at 81.  Accordingly, dismissal of his defamation claim against NYC is warranted.

### E.  False Imprisonment/False Arrest Under Section 1983

Plaintiff sues Defendants NYC, WC, and the arresting officers for false arrest and false imprisonment.  (See SAC ¶¶ 193-198.) Plaintiff specifically implicates NYC for "encourage[ing] [his] arrest by providing his picture to the City of New York in the February 24, 2018, email."[15]  (See SAC ¶ 195.)

Plaintiff claims that his arrest lacked probable cause for the same reasons articulated in his malicious prosecution claim. (See supra Section III.C.)  Plaintiff fails to rebut the presumption of probable cause by demonstrating that his indictment was "procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."  Grier, 2019 WL

---

[15] This appears to be a typographical error because NYC provided Plaintiff's photo to WC, not itself.  The Court overlooks this drafting mistake and interprets the allegation in line with the complaint's other claims.

1171760, at *4; <u>Manzi v. Goldfine</u>, No. 23 Civ. 05176 (PMH), 2024
WL 2943876, at *5 (S.D.N.Y. June 10, 2024) (dismissing a false
arrest claim where Plaintiff "failed to allege that Defendants
'knowingly and intentionally' made any false statements or
omissions that would be relevant to the probable cause
determination." (quoting <u>Gleis v. Buehler</u>, 374 F. App'x 218, 220
(2d Cir. 2010))).  "The existence of probable cause to arrest
constitutes justification and is a complete defense to an action
for false arrest[.]"  <u>Jenkins v. City of N.Y.</u>, 478 F.3d 76, 84 (2d
Cir. 2007) (internal quotations omitted).  The facts Plaintiff
recites regarding his arrest fail to allege any official misconduct
whatsoever and merely underscore weaknesses in the prosecution's
case against him.  Without more, Plaintiff's claim of false arrest
and imprisonment remains "mere conjecture."  <u>Savino</u>, 331 F.3d
at 73.  For the same reasons set out above, because Plaintiff has
failed to allege facts that rebut the presumption of probable cause
arising from his grand jury indictment, dismissal of his false
arrest and false imprisonment claims is warranted.  (<u>See</u> <u>supra</u>
Section III.C.)

**F.   National Origin Discrimination Under Section 1983**

Plaintiff claims he was identified as a robbery suspect for
the sole reason that he is Guinean.  (<u>See</u> SAC ¶¶ 200, 202.)  He
further alleges that if he "had a different name, like John Smith

instead of Ibrahima Diallo, his picture would not have been included" in the photo array. (<u>See</u> SAC ¶ 201.)

The Court construes his claim of national origin discrimination as a claim for selective law enforcement. Under Section 1983, these claims are analyzed under "the Fourteenth Amendment's Equal Protection Clause to be free from impermissible racial or national origin discrimination." <u>Barua v. City of N.Y.</u>, No. 14 Civ. 584 (NRB), 2016 WL 7494875, at *11 (S.D.N.Y. Dec. 29, 2016).

> To establish a violation of equal protection based on selective enforcement, [Plaintiff] must show: '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'

<u>Case v. City of N.Y.</u>, 233 F. Supp. 3d 372, 394 (S.D.N.Y. 2017) (quoting <u>Lisa's Party City, Inc. v. Town of Henrietta</u>, 185 F.3d 12, 16 (2d Cir. 1999)); <u>see also</u> <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001). The law requires a comparison with similarly situated individuals because "courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." <u>Pyke v. Cuomo</u>, 258 F.3d 107, 109 (2d Cir. 2001).[16]

---

[16] The parties disagree about whether the Supreme Court's holding in <u>Gonzalez v. Trevino</u>, which in Plaintiff's view relaxes the
(continued on next page)

Here, Plaintiff's claim fails because he does not demonstrate
similar treatment based on national origin.  His assertions that
an individual with the name "John Smith" would have been treated
differently and that "New York City has a history of discriminating
against [Plaintiff] and immigrants" are conclusory and
insufficient to compare Plaintiff's case to any other individual.
(See SAC ¶¶ 2, 201.)  The similarly situated standard requires
some context for comparing Plaintiff's claim to other individuals
who were not prosecuted.  The only context Plaintiff provides is
that NYC only provided images of Guineans and WC prepared a photo
array where Plaintiff was the only Guinean.  This limited
information is insufficient to allege selective enforcement.  See
Crespo v. Rivera, No. 16 Civ. 708 (PGG), 2018 WL 4500868, at *16
(S.D.N.Y. Sept. 19, 2018) (dismissing selective prosecution claim
because plaintiff had not "pled any facts concerning similarly
situated comparators"); Case, 233 F. Supp. 3d at 395 (dismissing

---

(cont'd) standard for comparing Plaintiff with similarly
situated individuals, applies here.  (Pl. Opp'n Mem. to NYC at
6-7; NYC Reply at 2.)  In Gonzalez, the plaintiff alleged a
claim of retaliatory arrest for speech protected by the First
Amendment and provided evidence that no one has ever been
arrested for engaging in similar conduct, which the Supreme
Court found was sufficient "comparator evidence."  602 U.S. at
656-58.  Gonzalez has limited relevance to the present case.
Here, Plaintiff alleges a claim of selective enforcement based
on national origin and not only is Plaintiff's "comparator
evidence" vastly different from that in Gonzalez and conclusory,
but also Plaintiff was only arrested and prosecuted after he was
identified in a double-blind photo array by the victim, a far
cry from the situation in Gonzalez.

selective prosecution claim because "Plaintiffs fail to cite even
one comparative case where Defendants applied a different policy
to [similarly situated individuals]").   Additionally, Plaintiff
fails to acknowledge that he was arrested and prosecuted only after
he was identified by the victim – which completely undercuts his
selective enforcement claim.   Accordingly, Plaintiff's claim must
be dismissed.

### G.   Free Exercise Clause of the First Amendment

Plaintiff claims that WC violated his First Amendment right
to the free exercise of religion by subjecting him to a strip
search and by denying him a prayer mat.   (See SAC ¶¶ 213-225.)

"The Free Exercise Clause of the First Amendment states,
'Congress shall make no law . . . prohibiting the free exercise'
of religion."   Pena v. Morton, No. 19 Civ. 07336 (NSR), 2022 WL
657045, at *3 (S.D.N.Y Mar. 4, 2022) (quoting U.S. CONST. amend.
1).   Specifically, "[p]rison inmates are protected by the clause,
though not necessarily to the same extent as others."   Id.

> To assess a free exercise claim, a court must determine
> (1) whether the practice asserted is religious in the
> person's scheme of beliefs, and whether the belief is
> sincerely held; (2) whether the challenged practice of the
> prison officials infringes upon the religious belief; and
> (3) whether the challenged practice of the prison officials
> further legitimate penological objectives.

Kravitz, 87 F.4th at 128 (quoting Farid v. Smith, 850 F.2d 917, 926
(2d Cir. 1988) (alterations omitted).   "Generally, strip searches
have been upheld as a reasonable security measure within a

correctional facility even in the absence of probable cause as long as they are related to a legitimate penological goal." Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) aff'd, 461 F. App'x 18 (2d Cir. 2012). "[C]ourts in this District have consistently rejected claims that standard strip searches violate the First Amendment rights of Muslim inmates whose religion might forbid them from being seen naked by other individuals." Pizarro v. Bd. of Corr., 16 Civ. 2418 (RJS), 2018 WL 3462512, at *5 (S.D.N.Y. July 17, 2018).

Plaintiff's strip search claim fails because he does not allege any facts which suggest Defendant's search policy lacked a legitimate penological interest. Here, Plaintiff alleges that he was strip searched upon being booked, pursuant to "§ 112.03 of the Westchester County Department of Public Safety Manual." (See SAC ¶ 219.) However, Plaintiff's claim merely identifies the practice and asserts that he was forced to comply against his religious morals. (See SAC ¶¶ 214-221.) Without more, Plaintiff does not allege that the search served no legitimate penological interest. Accordingly, his claim regarding the strip search is dismissed as a matter of law. See Cook v. City of N.Y., 19 Civ. 3858 (PKC) (JO), 2019 WL 3388909, at *2 (E.D.N.Y. July 26, 2019) (dismissing an unconstitutional strip search claim in part because plaintiff failed "to identify additional circumstances surrounding

the strip search at issue that indicate that the search was unrelated to any legitimate penological interest").

The Court next turns to Plaintiff's claim relating to denying him a prayer mat. While Plaintiff alleges a constitutional violation, he does not adequately allege WC's municipal liability.

Plaintiff alleges that WC's refusal to respond to his requests for a prayer mat "substantially burden[ed] his religious belief" by denying him the right to a practice he finds "vital." (See Pl. Opp'n Mem. to WC at 13; SAC ¶¶ 222-225.) Because Plaintiff's belief is that he must pray five times a day, he asserts he was denied the right to pray forty different times over the course of his eight days' imprisonment. (See SAC ¶ 224.) Nowhere in WC's papers does it assert a legitimate penological interest for denying Plaintiff a prayer mat. (See WC Mem. at 12-13.)

Moreover, WC is incorrect that "[t]he denial of an inmate's request for a prayer mat does not rise to the level of violation of the First Amendment's Free Exercise Clause."[17] (Id. at 13.) Here, at the motion to dismiss stage, Plaintiff's assertions

---

[17] The cases WC cites are inapplicable to Plaintiff's claim because he is Muslim and his beliefs about prayer are sincerely held. See Adekoya v. Herron, 10 Civ. 6646 (MAT), 2013 WL 6092507, at *5-8 (W.D.N.Y. Nov. 19, 2013) (denying a free exercise claim where Plaintiff who practiced African Spiritism did not allege substantial burden or sincerely held belief when denied a prayer mat); La Pointe v. Walker, 06-952 (DGW), 2010 U.S. Dist. LEXIS 96776, at *10 (S.D. Ill. Sept. 15, 2010) (same where Plaintiff was Christian).

concerning his religion, sincerely held beliefs about prayer, and the burden he incurred are sufficient to make a free exercise claim.  See Kravitz, 87 F.4th at 125 ("We now join those circuits that have held that an inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983.").

However, Plaintiff's claim fails against WC because he does not sufficiently allege that the denial of his prayer mat was because of an "official policy."  Staboleski v. City of N.Y., 19 Civ. 8834 (LJL), 2021 WL 796616, at *4 (S.D.N.Y. Mar. 1, 2021) (quoting Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)).

> A plaintiff may satisfy the 'policy or custom' requirement by alleging one of the following: '(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.'

Id. (quoting Johnson v. Paul, 17 Civ. 3654 (KMK), 2018 WL 2305657, at *3 (S.D.N.Y. May 21, 2018)).  Plaintiff alleges that "under Westchester County Department of Correction[s'] policy and practice, the jail did not make accommodation[s] for Mr. Diallo" and therefore "denied Mr. Diallo the right to pray 40 times." (See SAC ¶ 107.)  The assertion that such policy would be the County's

"officially endorsed" "formal policy," is nothing more than
conclusory conjecture. <u>Staboleski</u>, 2021 WL 796616, at *4.
Other than conclusory conjecture, Plaintiff fails to allege that
his inability to access a prayer mat meets any of the above
criteria. (<u>See</u> Pl. Opp'n Mem. to WC at 12-13; SAC ¶¶ 107,
222-225.) Without that connection, the Court has no basis on which
to assign liability to WC. <u>See</u> <u>Roe</u>, 542 F.3d at 36. Therefore,
dismissal of Plaintiff's free exercise claim is warranted.

### H.   Injunctive Relief Under Section 1983

Plaintiff seeks injunctive relief pursuant to Section 1983
against Defendants NYC and WC "to remove his profile from their
respective criminal databases." (SAC ¶ 240.) In his Opposition,
Plaintiff fails to address Defendants' arguments for why such
relief should be denied, stating only that "Plaintiff will have
sought injunctive relief when he moves for Injunctive Relief."
(<u>See</u> Pl. Opp'n Mem. to NYC at 22.) The Court construes this as an
indication that Plaintiff has abandoned his prayer for injunctive
relief. <u>Black Lives Matter v. Town of Clarkstown</u>, 354 F. Supp. 3d
313, 328 (S.D.N.Y. 2018) ("The failure to oppose a motion to
dismiss a claim is deemed abandonment of the claim."). This
construction is all the more appropriate as Plaintiff already had
an identical claim dismissed as abandoned for using the <u>exact</u> <u>same</u>
sentence to oppose Defendants' earlier motion to dismiss. (<u>See</u>
Mar. 19 Order at 14.) Where a party reiterates a response already

36

deemed to constitute abandonment, that response cannot maintain the claim.   Accordingly, dismissal of Plaintiff's claim for injunctive relief is warranted.

### I.   State Law Claims

The Court may decline to exercise supplemental jurisdiction over a claim where all claims over which it had original jurisdiction have been dismissed.   See 28 U.S.C. § 1367(c)(3). While district courts have discretion to exercise supplemental jurisdiction over remaining state law claims, when "all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction[.]"   Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 81 (2d Cir. 2018) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); see also Cummings v. City of N.Y., 19 Civ. 7723 (CM) (OTW), 2021 WL 1664421, at *2 (S.D.N.Y. Apr. 28, 2021) ("The Second Circuit takes a particularly strong view that district courts should decline to exercise supplemental jurisdiction in the absence of a 'clearly articulated federal interest.'" (quoting Kolari v. N.Y. Presbyterian Hosp., 455 F.3d 118, 123 (2d. Cir. 2006))).   Accordingly, Plaintiff's remaining state law claims are dismissed without prejudice so that they may be renewed in the proper state court.

IV.  **Conclusion**

For the foregoing reasons, Plaintiff's motion to strike, (Pl. Mot. to Strike NYC Reply), is DENIED, and Defendant NYC's motion to strike Plaintiff's letter, (NYC Opp'n to Pl. Mot. to Strike), is GRANTED.  Plaintiff's motion for leave to amend, (Pl. SAC Mot.), is DENIED.  Defendants WC and NYC's motions to dismiss Plaintiff's federal claims, (WC Mot. to Dismiss; NYC Mot. to Dismiss), are GRANTED.  Further, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and dismisses them without prejudice to renewal in a state court of competent jurisdiction.  Accordingly, the Clerk of the Court is respectfully directed to close dkt. nos. 69, 72, 86, 92, 95, and 96.

**SO ORDERED.**

Dated:    February 18, 2025
          New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge

38